to appeal 23-2079 United States v. Ronald Williams. Mr. DiCastro will begin with you. Thank you. May it please the court. I know it's been a long morning. I'll try to make this brief. This is a criminal appeal. As you know, arguing the sufficiency of the evidence after a verdict of guilty, which we do acknowledge is a heavy burden. We would like to say, however, although it is a high burden, it's not supposed to be insurmountable. Even though the jury's verdict is afforded great deference, it's not supposed to be absolute. The defendant should have the right and does have the right to come here and ask this court to take a good, hard look at whether the verdict was rationally based on the evidence. There are lots of reasons why a jury might want to find for guilt in a case like this. The victims clearly had been through terrible experiences, high emotions in a case like this. It was three weeks of evidence about what the co-defendant put them through. Mr. Williams was a driver for hire. He had a policy of not asking a lot of questions about what his customers were up to. Part of that is the culture of the neighborhood where he grew up and ran his business. And it is a shame, I think, that he's found guilty of a conspiracy for not asking enough questions. He's found guilty for what he didn't know, rather than for what he did know. The evidence with respect to specific elements was, I think, very thin in this case. With respect, for example, to whether victim B told Mr. Williams her age. If we can take her testimony and cast it in a different context, if she was in the business of handing off a bag of narcotics every week, and she was told, never open the bag, never talk about what's in it, and she testified, I was told this, I was scared of everybody, I never opened that bag, I never talked about it, except one day, the guy handed it to her, asked me what was in it, and I opened it and showed it to him. That's, I think, ridiculous enough that we can legitimately question whether it fails the standard that was set in Medina. The Medina case, which was helpfully cited by the government in their brief, says that it is possible for testimony to be, to lack credibility as a matter of law, where it's impossible. By its own terms, she told the jury that it would be impossible for her to do the thing, and then she testified that she did the thing. Then Mr. Williams asked and she told him. It is rational to question whether that is rational. It is rational to question whether this verdict rests on the evidence or on something else. And of all of the cases that come down, all of the opinions that we read state that this we are to afford the verdict great deference, but not absolute deference. We're being told that somewhere there's a line, somewhere there's a limit, and we have to keep looking for it, and these defendants have to keep bringing these appeals, asking, is this the case? Is this low enough? Is this evidence spare enough? The only evidence, the only case that comes readily to mind to illustrate the point comes from fiction, comes from To Kill a Mockingbird, where everybody understood that the verdict was not related in any way to the evidence. The only person surprised by it was the young girl. And I know this is fiction, it's not finding precedent, but the point is that story was a tragedy. And Mr. Williams, a 60-year-old man convicted and sentenced to 15 years, has the right to ask, has the right to review whether this case is such a tragedy. There are lots of reasons why a jury might want to validate these victims. I was there, I understand. They've been through a lot, but they were put through a lot at the hands of the co-defendant. Mr. Williams had very little, if anything, to do with what happened to these girls. They both understood this, each of them. Hannah, victim B, said, Spencer took me shopping. Slim was just driving. She understood the distinction. Mr. Williams was not a member of the conspiracy of the shopping trip. Logically, she understood that. Instinctively, she understood that. Similarly, victim A went sightseeing with Spencer. Spencer took her sightseeing and Williams drove them downtown. She didn't say they took me sightseeing. She said Spencer took me sightseeing. Williams just gave us a ride. So of the three legs on this stool of the evidence that was presented, of the text messages, the recorded statement of your client, and then the statement of the two girls, which of those three are you indicating is the weakest such that it would result in a ruling for your client? With respect to each element, I think there's a different answer. Looking at the element of whether victim B told him her age and whether he asked it and whether she told him, I think that's the stool, the leg of the stool in question is her credibility, the credibility of that specific statement and the fact that it's contradicted by all of the other evidence of her own statement, all of the other evidence of Mr. Williams' attitude as his testimony as presented through the video. With respect to whether he was able to identify, whether his identification of a photograph during his statement as when he was asked, what about this one? And he said 16 or 17. And that was presented to the jury as proof that he had confessed that he knew this person in real life was 16 or 17. When in fact, it was only proof that he acknowledged that a photograph appeared to be of a person of around that age. If the jury is shown an apple and told that it's an orange, their verdict that it's an orange is not rational, just because they're told that. They weren't shown any evidence of that. So there's a different leg of the stool. With respect to the conspiracy, it comes to the larger picture and whether he knew enough, whether he was involved enough. I can understand why the jury might be shocked at what happened to these victims. And they might actually be angry that Mr. Williams was not more shocked, that he didn't ask more questions, that he didn't refuse. Mr. Williams knew he was dealing with prostitution, but prostitution is not sex trafficking. There are further elements. And it is certainly understandable on an emotional level why the jury might return a verdict of guilty because they don't approve of what he approved of. They don't approve of his turning a blind eye to what was happening. But that's not the same as finding the elements based on the evidence. That's condemning his behavior on an emotional level. There wasn't enough evidence to justify it. The verdict cannot be understood to have stemmed rationally from the evidence. It must have come some other way. Mr. Williams has the right to ask this court to take a good hard look at these questions and not just be satisfied. There was a verdict, so we call it a day. There was some evidence, so we call it a day. These aren't the enough. That's the question. Not do they exist. We acknowledge Hannah's testimony. We acknowledge Cyanne's testimony. We acknowledge the verdict. What we question is whether those points of testimony rationally support the verdict. And that's a legitimate question we ask for this court's serious consideration. Thank you. Thank you. You'll reserve the rest of your time, Mr. DiCastro. Mr. Erskine, we'll move to you. May it please the court, Andrew Erskine for the United States. The evidence presented at trial was sufficient to support the verdict in this case. In particular, it was sufficient as to the defendant's reasonable opportunity to observe the victims, his knowledge or reckless disregard of the victims' ages, his knowledge or reckless disregard that fraud or coercion would be used to cause Cyanne to engage in commercial sex, and his knowing participation in the charged conspiracy. At a minimum, the evidence was sufficient to support the conclusion or the issue now challenged that the defendant had the reasonable opportunity to observe the victims. As your Honor noted, that was premised on the testimony of the victims, the text messages, as well as his own post-arrest video recorded statement. On the question of credibility, as I understand the standard of review with regard to credibility, it is not a witness, the standard is not a witness said one thing in a number of instances in the testimony and then something that appeared to contradict that as a matter of perhaps consistency. It's, as I read the cases, physical impossibility that what they're saying is physically impossible. So the testimony ought to be credited here on review, and both victims testified that the defendant drove them on and with Hannah, you know, some of these trips were an hour each way. Hannah testified that the defendant propositioned her for sex multiple times, which of course supports the inference that he was able to reasonably observe her, and again, as my friend noted, the defendant drove Hannah and co-defendant Spencer to go shopping soon after Hannah arrived. Cyanne further added in her testimony that the defendant was there when she first arrived, picked her up from the train station with the co-defendant, that the defendant, Mr. Williams, went inside that first house with her during her first unsuspected sex date, and that they had actually eaten together at a Burger King one time. In his post-arrest interview, the defendant called himself a detective. When he was describing for the agent a text message between himself and Spencer, he was describing the photo that Spencer had sent him, because the text message returns didn't actually have the photos in them. So the FBI agent was asking defendant Williams, what was this photo, and during the interview, Williams described it, and that same photo was shown per the description to the jury at trial. Was the jury instructed on aiding and abetting theory? Yes, I believe they were instructed on aiding and abetting theory, yes, under Section 2. You were trial counsel, correct? Correct. There's a statement on page 32 of your brief concerning evidence that Williams was present for Spencer's comments to Cyanne that Spencer would beat up Hannah if he found her. I don't see a citation in the brief to where that would have happened. Are you aware of when? Yes, Your Honor, and I thank the court for bringing that up. I intended to clarify that point here. There is an ambiguity in the direct testimony of Cyanne. I'm sorry, you spoke of Cyanne, correct? Correct. There is an ambiguity in the direct testimony where it's not clear whether the comments about the threats of violence were in the presence of Williams or not. But if you look at pages 769 to page 970 of the trial transcript, which is actually the cross-examination by Mr. DiCastro of Cyanne, she explicitly makes clear that in that car ride with both Spencer and Defendant Williams is when Spencer was making threats of violence about Hannah in Cyanne's presence and in Defendant Williams' presence. And just finishing the thought on fraud and coercion, there was also sufficient evidence to allow the jury to reach that reasonable conclusion. In addition to that coercive encounter that we just talked about, there's also the fraudulent, and it's important to keep in mind that that happens during the car ride to the first sex from the train station when Cyanne is first being picked up. The first thing she's exposed to is Spencer making these threats, talking in this way about Hannah in front of the defendant. She's then brought to the house where she is as she described an older man. She goes back into the car, and because she didn't realize this is what was happening, she asks, you know, why didn't you tell me? Why didn't you tell me? And Spencer says, I forgot. And Williams is in the car with him too. So that also supports this conclusion that he's in reckless disregard that fraud, bringing her unawares to sex dates, would be also used to cause her to engage in commercial sex. What evidence was there on the question of money? How did the defendant receive money for his participation? There was ample evidence of that, both through the testimony of the victims as well as his own post-arrest statement. Essentially, they would go on the date and the text messages to show the explicit negotiation between him and Spencer, but the short answer is that the victim would come out of the date with cash in hand, hand all of it to Spencer. Spencer would keep some, give it back to the victim, and the victim had to give some portion to Williams. So the defendant Williams' cut was always out of the money that the victim generated through the commercial sex date. And, you know, yeah. So, and then finally, there's the question of conspiracy. And the evidence also was sufficient to support the jury's reasonable conclusion that the defendant was a knowing participant in the charged conspiracy. Again, the defendant in his post-arrest didn't deny that he was driving these victims to commercial sex dates. And, you know, for the reasons that I already talked about, actually, pause for a second. On the question of age, there was the reasonable opportunity to observe, as I discussed, but there was also evidence of his actual knowledge or reckless disregard of their ages. Hannah testified that defendant Williams asked her her age, and she told him she was 17. Spencer was there. He told her it's okay. As Mr. DeCastro noted during his post-arrest interview, the defendant was shown pictures of both victims, and in relation to Cyan, he said 16. He was asked, how old are they? He says, I don't know. And then with regard to Hannah, he says she was saying 22. And then they point to the picture of Cyan, which Barker testified, the agent testified, was a picture of Cyan. And the defendant says, I have no idea, 16, 17, some shit. I bring this up because the question was not, how old does this girl look in this picture? It is, how old were these girls? And he knew that was the question because he talked about Hannah saying she was 22, claiming to be 22. So it's clear, or at least it was reasonable for the jury to conclude, that that was an admission by the defendant of his knowledge or reckless disregard of her minor age. So then going back to conspiracy, you have, you know, his understanding through his post-harassment that he's driving these victims to commercial sex states. We have the mens rea of the age and the fraud and coercion that we already discussed. The evidence also showed that he was not merely an arm's length driver, Uber driver, as it was argued. And in fact, he did not actually have a policy of not asking a lot of questions. His policy was to ask questions, and that's how you know and how the jury knew that he was an owing member of this conspiracy. The text messages make that very clear. He's asking whether they have arrived yet. He's asking that question multiple times. He said that he would check the train schedule. He offered to have someone who he knew in South Bend, Indiana, essentially check into, look into the story offered by Cyan as to why she had not come when she initially said she was going to. And then in one text exchange, Spencer said, we missed out on about $280 today, to which the defendant responded, hopefully there will be other times, haha, tomorrow. So the text message was certainly a sufficient basis for the jury to reasonably conclude that he was a knowing participant who aimed to make this thing succeed so he could get his cut of the funds. And for those reasons, unless there are any other questions, the government asks that the verdict be affirmed. Thank you very much, Mr. Erskine. Mr. DeCascio, we'll go back to you now for rebuttal arguments. First, Judge Ripple, with respect to your question about the money, the fees were arranged by agreement between Spencer and Williams ahead of time. They were not related to any kind of percentage or cut or anything like that. It was based on how far was the trip, how much is the gas going to cost. When he drove a long trip, he asked at one point to increase his fee from $100 to $110 gas purposes. When Hannah and Sian both testified about giving him money, it was for driving. They specified that they were paying him for driving. These arrangements were not, as I said, based on a percentage. There were times when they took that long drive and saw one or two clients or when they saw more clients. If they saw more clients, they made more money, but Mr. Williams didn't. He made the same amount of money. The next question I also wanted to address was about the photograph that I talked about earlier. During Mr. Williams' post-arrest interrogation, he was shown, he was asked several times, how old did these girls tell you? How old did you think they were? He said several times that they were, they claimed to be 21, 22. I don't know how old they were. I thought 19 or 20. I didn't pay attention. He was asked repeatedly. He was told the answer. The agent said, why would we be interested in them unless they were underage? Now, I'm going to ask you again. How old do you think they were? Oh, well, I guess maybe this one might have been. And they showed him a picture and they said, how about this one? This is the question, how old is this girl in this picture? The exact question Mr. Erskine just told you it wasn't. That's the whether that picture reasonably or accurately portrayed the way that Sian looked when Mr. Williams had an opportunity to view her the real person. That picture was never shown to anybody. We don't know what picture he was looking at. He could have been looking at a picture of Sian from her middle school years. Thank you very much, Mr. DiCastro. Thank you, Mr. Erskine. The case will move down to our final case of the day. This is